which I should state for the record, who will listen to the oral argument, read the briefs and participate fully in the decision of this cause. As far as the argument today, I think you've got the two of us. So with that being stated initially, counsel, you may proceed. Thank you. My name is Aaron Carnine. I represent the mom in this matter, Stacy Kohlbrecher, who is also the appellant and was the respondent in the trial court. Our ultimate request today is with respect to physical custody. The trial court awarded joint legal custody to the parties. Nobody is disputing that. The trial court also awarded primary physical custody to the father. It is my suggestion that that award was against the manifest weight of the evidence and our ultimate request that this court finds that, based on the testimony and evidence, that the award of primary custody to the father was against the manifest weight of the evidence and that this court find the same and remand for direction to award mom primary physical custody. The child was born July 30, 2007. The child is currently almost four years old. The petition for disillusionment was filed August 2009. The final judgment was entered December 2010. The court, the trial court in this order, found a couple of important things. The trial court found that the parties were able to cooperate effectively and consistently and then therefore awarded joint legal custody to both of them. The court found that the child is comfortable in the mother's new home. The father lives in St. Rose, Illinois. The mother, after the petition for dissolution was filed, began to establish her new residence in Carlisle. The trial court's finding was that the child is comfortable in that new home as well. With respect to the factors of 750 ILCS 5-602, it is those factors that the court presumably considered in its decision. Factors 1 through 6, the court either specifically said are a wash or not applicable. Factors 1 through 6 are essentially all the factors except the physical violence factors. The wishes of the parties, the relationship of the child, adjustment to home health of individuals, and essentially the trial court found that those factors are either a wash or not applicable. What I'm here saying is that those factors are not a wash. The very first, the second factor on that list, I'll strike that, the very first factor on the parents. Now, I consider that to be the most important factor in this particular case and in many other cases. Not only the wishes of the parents is important, but the statute also indicates before it starts listing the factors, it says all relevant factors. Now, one would tend to think that it's obvious with respect to the wishes of the parents. Both parties are just in disagreement as the primary physical custody, therefore both parties wish to have their child. Well, the real question is, it really doesn't take the filling of a seat in a trial court to show that you have the same wish as the other party. My point being, in order to determine the wishes of the parents, you have to look at the history that created the circumstance and the history of the file to get the parties there in the first place. So, when I say that the decision was beyond the manifest weight of the evidence, the general evidence was in general and then specifically mom took care of the child. Mom's testimony was a laundry list of care that she has given for the child from starting from maternity leave for a couple of months through medical appointments, homework to the extent a three-year-old can have homework, mom would read books to child, mom would sing songs, mom would tell stories, mom would do leg work for getting the books, the stories, the breakfasts, the details that make up a good parent. There are not issues of sports or school grades or anything because we have a child that's three years old, therefore we have to look at what it takes to raise a child to that point. And what it takes in this circumstance is what mom did and took over for the length of this time. The laundry list includes things such as actually doing laundry, cooking. Mom was the initiator to get child to daycare. Mom disliked the first daycare, so she moved child to another daycare. Between daycares, mom is the one that took off work to watch the child while they found an additional daycare. Mom is the one up in the middle of the night. Mom does the breakfast, now mom does the shopping. There was an exhibit that had receipts in it. The purpose of the receipts were to show that mom does leg work. Mom is out, mom takes care of not only buying the cereal but putting it in the bowl and washing the bowl after it's done every day during the relationship. Now after the petition was filed, mom started establishing a new house in another town. She lives there currently. Even during that time, mom would do the laundry and the cooking at both houses. Now the question is, what did father do? How does the history of the father's behavior and help with this child show his wishes for custody? Well, during the petition, he chose not to spend time with the child, he chose to spend it with his own pursuits. Examples include, father decided to join a trap shooting league on every Thursday night. Father would be absent from the home, sometimes until 10 or 11 o'clock at night, but in any respect, beyond the time that the child was away. So after the petition, father has involved himself in a trap shooting league, Thursday nights. Now, Monday nights, father involved himself in pool league, while father plays pool around various bars close by. Necessarily, those two nights, mom is the one that is at home, that is also taking care of the child and doing all those details that make a parent make a best interest consideration when you've got a one, two, and three-year-old child. Why did father trap shoot and play pool? Father's answer, blame mom. Father has to go trap shoot in the pool because there's tension at the house. So father's, to solve that problem, he leaves to his own pursuits, has fun shooting guns, playing pool. Now, mom also introduced new activities to her schedule after a divorce was inevitable, and that activity was going to church. She had not gone to church before. However, the distinction is not church, but that she took the child with her. Mom's additional activities included child. Dad's additional activities were for himself, and not spending time with the child. Now, I recognize that, with respect to that concept, credibility is important, and it's the trial court that determines credibility. The trial court said several factors are awash, but the trial court specifically said that. The trial court believes father absented himself for shooting guns in the pool, which means the trial court found him credible in his explanation of that. That's why in my brief, I quoted that portion of the file where father was answering those questions. My point being, those quotes are essentially father saying yes and no. And my suggestion is, it is very difficult to determine credibility from the record. The only responses that father has to those purported reasons as to why he's shooting guns in the pool are simply yes or no answers. There is nothing that the father actually said on his own confirming that that was his reasoning. Isn't that more strategy called by the attorney trying the case? It is. You're absolutely correct, it is. And that's why it is correct that there were no objections in there to that, which is why I'm suggesting that it's a credibility issue for that type of question. So you're basically saying there was an insufficient window on his credibility for the trial court to make that decision? Yes, especially with respect to that, because the trial court in their factors, they specifically picked out that issue, the crime shooting. They also singled out one other issue, which they suggested, intentionally refusing overnight visitation by mom to dad and physical violence issues. But the trial court did have an opportunity to make a determination on credibility based on the entirety of his testimony, plus demeanor in the courtroom and everything else that a trial judge has an opportunity to consider, and that we as a court of review don't. That is correct, your honor. I mean, that is absolutely correct. The court did have the opportunity to review on all the parties, which is essentially why my point here is essentially that that was against the manifest weight of the evidence. Despite the credibility as to the explanation of shooting guns and playing pool, you need to look at the history of the file with respect to who took care of this child, who was the primary parent during the whole time. But absolutely, the trial court has that discretion. The trial court also noted that had a concern with respect to saying that mom intentionally refused to allow overnight visitation with the child and as a result interfered with the relationship between father and child. That was another important point with the trial court. Yet, if you look at the circumstances in this file, parties lived together the whole time. There was and there were no temporary orders. There were no temporary orders as distinguishing or deciding what visitation was. And that is actually similar to the trial court's other consideration where the trial court seems to rely solely on physical violence factors. The testimony indicated that both parties testified with respect to those. And again, it is a matter of credibility. Mom testified that these incidents were mutual. And in fact, one of the incidents was while mom was actually pregnant. But looking at the totality of circumstances, the parties say lived together during the pendency of this matter. There were no temporary orders. There were no temporary visitation issues. And there were nobody ran back to the court to try to resolve everything. And the court itself said joint legal custody. And the court's own words were, parties are able to cooperate effectively and consistently. So by that fact, it lends itself to the concept that award of primary custody to dad based on those circumstances doesn't make any sense because it not only doesn't make any sense because of the their living arrangements and to the lack of any temporary orders or even child support orders. So the circumstances in which father to have an overnight would be odd because mom would specifically have to leave the home for father to have an overnight. However, since mom is the all the gritty things that make a mom, purposely leaving the home would have meant that mom would have had to take care of all those things, leave the home for a particular purpose, and then come back simply to say that father had an overnight. It was not necessarily an issue because the parties actually lived together. Also, mom had established another residence, but she didn't stay there exclusively. She would stay there on weekends with the child, which was still fine with the husband. There were no witnesses that testified as to any kind of interference. The parties themselves, actually, the husband actually testified that. He would have family events on Sundays, for example, and mom did not interfere with that. There was no testimony of any kind of interference with the father's right to this child. The only interference I see is the father's own decision to not have a relationship with his child by spending his time on his own pursuits. That's kind of my conclusion, the concept being mom is the one that took care of child all this time. Mom's own pursuits, her own hobbies, involved child. Dad's primary testimony was about defending himself as to blaming mom as to why he's absenting himself from the home and therefore absenting himself from the child. There was no testimony saying that if father didn't ask, he couldn't have had a child or taken a child with him on a Saturday or an evening or something. He just chose not to. The last point is with respect to the sex of the child, the court can't consider it. It's not a tender years doctrine, but this is a female child. Whether it's a boy or a girl, we've got a mom who took care of a child, does the gritty leg work to get it done. Boy or girl, I know you've got a dad who plays, shoots guns, plays pool, watches wrestling, and plays video games. Prior to his pool shooting and trap shooting, he was playing a video game called Mafia Wars in which he spent $500 of real world money online prior to the shooting. Thank you, counsel. It please the court, justices, Mr. Carnine, I represent Mr. Neil Colbrecker, the appellee in this case and the petitioner in the pending disillusion case. Contrary to the last case that I argued before this court, Judge McHaney entered a very, very extensive order regarding the custody of this child. He went through the very specific findings that you must make. He specifically, in determining whether or not joint custody was available, he went through whether or not there should be a shared custody. He went through whether joint custody was simply a tool to maximize involvement with both parents. And then he found that joint custody was an appropriate thing. Then once he found that joint custody was an appropriate thing, he had to deal with the 602 factors. He then went specifically through those 602 factors. I'd like to address those briefly, but before that, I'd like to talk a little bit about why they felt the court's decision was against a manifest way to the evidence. They spent a great deal of time both in their brief and today talking about the amount of time that mom spent with the child. I went back through, and I believe it's cited in my brief also, her testimony, the respondent's testimony at trial about whether or not dad spent time with the child. She said that the, sorry, I missed my spot here. She said that dad was actively involved in raising Haley, actively involved. This is her testimony. She also indicated that both parents were actively involved in raising Haley. She also testified about her work schedule. And I don't know if the court's had an opportunity to review the transcript on it or my brief regarding it, but she works in Centralia, which is several miles away from St. Rose, where the parties were living at the time. Often she would have to go early in the morning and leave and go to work. During those times, she testified, not Neal. She testified, Neal would take care of the child. Their work schedule would change. And during those times, she'd come home late at night, it was Neal who also got off of work, got the job, took care of the job, handled all those for the child. She then testified that her work schedule had changed long before we came to trial and she brought a calendar to support that. But I'm looking through the calendar. It was only a couple of months before that, that her calendar was showing she was still going into work real early and staying at work real late. Presumably Neal was taking care of the child. They indicated, she indicated that the parties would go to the doctor's appointments together, that they actually interviewed daycare providers together. The court addressed all those things. The court even said that they looked at all those things. The court even looked at Stacey's view that these activities of dad were something nefarious, that he should be punished because of that. The court indicated that, I've looked at that. I disagree with you. After testing the credibility of the parties, and they're the primary person to test the credibility of the parties, the court went on to say that Stacey argues that Neal spent substantial amounts of time bowling, crap shooting, which she contends proves that he's more interested in activities with his buddies than taking care of him. Exactly the same argument they made today. Then the court says, this court disagrees. Neal went on those activities, played internet games, to have sent himself. Is it due to the incredible amount of tension existing between the parties? Now, in addition to that, the court also talked about the physical abuse, none of which was perpetrated by my client on Stacey, but rather by Stacey on Neal. Many of which, many of those instances, weren't even disagreed with by Stacey, but she chalked them up to other factors. One of which happened in the presence of the child, and the child could have been injured. The court took that very seriously. The court also took seriously this fact. The parties did live together after this case was over, even though Stacey had bought a house in Carlisle long before the trial was taking place. She didn't move there. She came back to the residence and stayed at the residence, only to make sure that Neal didn't have overnight time with the child. Presumably, so that he couldn't establish this type of caretaking that she now argues he didn't undertake. Neal, on his end, said, take the child, have her get used to the home, have her get used to this home in Carlisle. She's never been there before. You need to be spending time. The question with regard to that factor was, factor number eight, I believe it is, is the willingness of the proposed custodial parent to facilitate and encourage a relationship between the child and the non-custodial parent. Judge McKamey said, this shows that Stacey's actions show, I believe he used the term her unabashed, I think that's what it was, unabashed refusal to allow overnight time between Neal and the child. In other words, she wasn't even apologetic for the fact that she stepped in the way. And the court found that to be a very important factor, coupled with the physical abuse factor. The court also weighed, but did not give it as much credence as we had hoped, the interreaction and interrelationship between the child and her half-sister Crystal. She didn't, he didn't give it as much weight. The court did not address the schooling issues and the school district issues, which both parties testified, my client's home in St. Rose had a better school district than the school district in Carlisle. Both Stacey testified to that, the petition, or the petitioner Neal testified to that, and there were exhibits on it. And the court didn't think that was very important. The court finally addressed the issue of sex of the child. He said the sex of the child is a factor, but it's not a controlling factor. And he addressed it quite accurately. He addressed it quite adequately. He went through a litany of, not only a litany of the factors which the, which the court's required to address under 602, but he addressed those factors that we indicated in our closing arguments and respondent indicated in her closing arguments were important factors outside of it. After addressing all of those factors and judging the credibility of witnesses, which is exactly what he's supposed to do under the plethora of cases that we've cited and cases the appellate has cited quite frankly, he decided that primary custody was best with Neal. And he set, and he set forth his reasons for it therein. He set forth a circumstances by which he believed that Neal would promote that relationship between Kaylee and Stacey, as opposed to the other way around. It was based upon those things and very, very careful thought and consideration that he entered the opinion that Neal Kovac should have primary custody of his child. Our position quite frankly, Your Honor, is that we believe that Judge McKinney's order was accurate. It was thorough and it addressed all those issues, which all the precedent dictates are mandated for purposes of entering a custody order. A custody order, as Justice Goldenherz said in our last case, was one of the, is one of the prime decisions a court can make. One of the most important decisions a court can make. It requires a careful amount of evaluation, a careful amount of understanding, and a careful amount of detail. In this court order, Judge McKinney observed all of those obligations that he had in entering his order. So we'd ask the court to respectfully affirm the lower court's decision in this case. And if there are no questions, I'll thank the justices. Thank you, counsel. Thank you. Counsel was correct with respect to the husband, wife's work schedule, and absolutely when wife was working, husband would watch child. That is an indication that husband would watch child kind of when he had to. If mom was there, mom was the one that was taking care of child. Certainly when mom's not there, then the obligation falls to dad and he would do good. Secondly, with respect to physical abuse, the factors from 602 Part B indicates, court shall not consider conduct of a present or proposed custodian that does not affect his relationship to the child. There's no evidence or testimony regarding that this, that any of the child would have been present for one such event, but nothing else that indicates that that caused a concern or caused a problem with the child. And last, the suggestion or insinuation was that mom purposely deprived dad of overnights so that he would not be able to participate in bath time, if you will. Well, two things. One, he never had participated in bath time before anyway. So for them to suggest that, and when I say bath time, I also include certainly the laundry list of things that a two-year-old child requires from breakfast to dinner. They're correct. Dad had never done it before anyway. So if the court, if the trial court thought that mom was purposely doing that, then is the remedy actually to award primary custody of the girl to dad who had never done those things before anyway? He will certainly have his opportunity at a regular visitation times. And in fact, that's all I have here. I would ask that my same request as earlier with respect to the reversal of remand. Thank you for your time. We appreciate the brief arguments of both counsel and we will take your advice.